# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HARDAGE HOTELS II, L.P.,[1] | ) | Case No. 11-10518 (BLS) |
| | ) | |
| Debtor. | ) | |

## DECLARATION OF SAMUEL HARDAGE IN SUPPORT OF FIRST DAY MOTIONS

I, Samuel A. Hardage, hereby declare that the following is true to the best of my knowledge, information and belief:

1. I am the President of HSH II, Inc., the general partner of the above-captioned debtor and debtor in possession (the "Debtor" or the "Company"). I am also Chairman of The Hardage Group, a hotel management, franchise and development company based in San Diego, California. My current duties for the Debtor includes general supervision of, and responsibility for, the Debtor's business and financial affairs and activities and reviewing, formulating and assisting with the Debtor's business plans and strategies. I am authorized to make decisions with respect to all aspects of the management and operation of the Debtor's business including, without limitation, organization, human resources, marketing, sales, logistics, finance, administration, oversight, and of the prosecution of these bankruptcy cases. In my capacities with the Debtor, I have general knowledge of the books and records of the Debtor, and am familiar with the Debtor's financial and operational affairs.

---

[1] The last four digits of the Debtor's federal tax identification number is (3250). The Debtor's address is 1380 Piccard Drive, Rockville, MD 20850.

2. I submit this declaration (the "Declaration") in support of the Debtor's petitions and "first day" motions and applications, described further below (collectively, the "First Day Motions"). Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees, or my opinion based on my experience with the Debtor's operations and financial condition. In making my statements based on my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees, I have relied upon these employees accurately recording, preparing or collecting any such documentation and other information. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this Declaration on behalf of the Debtor.

3. Based on my personal knowledge, and through my review of the Debtor's books, records and other information, I believe that the relief sought by the Debtor in the First Day Motions is necessary to enable the Debtor to continue to operate as a debtor in possession during the course of its bankruptcy case.

4. Part I of this Declaration describes the business of the Debtor and the developments that led to its filing for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Part II of this Declaration sets forth the relevant facts in support of the First Day Motions filed concurrently herewith in support of this chapter 11 case (the "Case").[2]

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

# PART I

## A. Overview of the Debtor

### Business Operations

5.  The Debtor owns the Chase Suite Hotel Rockville (the "Hotel") located in Rockville, Maryland. The Hotel caters to business and leisure travelers in the greater Washington D.C. area and offers a variety of amenities, including a fitness center, a business conference center, the Rock Grille Bar & Restaurant, and swimming pool. The Hotel offers one- and two-bedroom suites, executive suites, and standard sized-rooms. In total, the Hotel consists of 219 rooms.

### Employee Structure

6.  The Debtor does not employ any personnel. All personnel that perform work directly for the Hotel are employees of Woodfin Suite Hotels, LLC ("WSH"), a nondebtor affiliate of the Debtor. Hardage Group Management, LLC ("HGM"), is the franchisor for the Hotel's "Chase Suites Hotel" flag under a Franchise Agreement, dated as of January 1996, as amended, between the Debtor and WSH.

7.  The Hotel is managed by HGM (the "Hotel Manager"), under a Hotel Management Agreement with the Debtor, dated as of December 31, 2008 (the "Hotel Management Agreement"). Under the Hotel Management Agreement, the Hotel Manager (among other things) supervises every department of the Hotel, and provides the Hotel with its employees, which are deemed to be employees of the Manager under the express terms of the Hotel Management Agreement. Also, under the Hotel Management Agreement, the Hotel

Manager is paid a monthly management fee of 4% of gross revenue and accounting fee of $2,500 (increasing 3% annually).

8. The Hotel currently utilizes 40 employees (the "Employees"), who work solely at the Hotel (the Hotel Manager also provides the Hotel with administrative services, which are provided by its employees, which also do work for other affiliates, for which the Hotel is charged for the Hotel's share of their work). Eight of the Employees are full-time salaried employees, 26 of the Employees are full-time hourly employees and 6 Employees are part-time hourly employees. The Employees participate in benefits maintained by the Hotel Manager that are provided as well to employees of the Hotel Manager and its and the Debtor's other nondebtor affiliates.

9. Payroll is paid on a semi-monthly basis, with the first pay period running from the first through the fifteenth day of the month and the second pay period running from the sixteenth through the last day of the month, with paychecks distributed on the sixth and twenty-first day of each month, unless the pay date falls on a weekend or holiday. The next payroll for the Employees, to be funded on March 3, 2011 and paid on March 4, 2011, will be in an amount of approximately $44,000).

10. Employees are entitled to earn vacation time (without payment for unused vacation) and are provided with sick leave and other leaves. The Hotel Manager also provides full-time employees with (depending on the type of employee – salaried or hourly) health, dental (for some, voluntary dental), short-term disability and life/AD&D insurance, flexible spending accounts and the ability to participate in a non-matching 401(k) plan (part-time employees are

provided access to some voluntary insurance). Employees are also provided with lodging and restaurant discounts, and are reimbursed for expenses incurred on behalf of the Hotel. The Hotel Manager also maintains workers' compensation insurance. The total cost of benefits for the Employees average approximately $14,410 monthly.

11. All Employees were paid through the full pay period prior to Petition Date, which ended on February 15, 2010. Employees first paycheck after the Petition Date will include payment for the prepetition period from February 16, 2011 to the Petition Date. Also, Employees are entitled to use vacation that accrued prepetition, be paid for unused sick leave that accrued prepretition and may be paid severance upon separation from employment with the Hotel.

12. Under the Hotel Management Agreement, the amounts paid to or on behalf of Employees are paid by the Hotel Manager from the operations of the Hotel, with any shortfall to be made up by the Debtor, and the Hotel Manger may direct the Debtor to pay employee, vendor and other Hotel obligations directly. Also, under the terms of the Hotel Management Agreement, the Hotel Manager is an independent contractor, and the Debtor's obligations under the Hotel Management Agreement are to the Hotel Manager (and not directly to the Employees or any other third party).

13. The Debtor has been paying the Hotel Manager monthly under the Hotel Management Agreement since mid-March 2010. Nevertheless, the Debtor has a prepetition intercompany payable accrued to the Hotel Manager under the Hotel Management Agreement of $2,223,038 for payments that had not been prior to that time.

14. The Debtor does not plan (nor is it seeking authorization) to pay the Hotel Manager its prepetition claim at this time, as the Hotel Management Agreement has not been assumed. The Debtor is not seeking to assume or reject the Hotel Management Agreement at this time, but is performing under its postpetition pending such agreement's assumption or rejection.

**B.    The Debtor's Corporate Structure and History**

15. The Debtor was originally founded in 1988. As a limited partnership, the Debtor's ownership structure is divided between a general partner and a limited partner. The 99% limited partner of the Debtor is the non-debtor affiliate Hardage Equity, LLC. The 1% general partner of the Debtor is the non-debtor affiliate HSH II, Inc. As mentioned above, I am also the President of HSH II, Inc.

**C.    Significant Indebtedness**

16. In January 1996, the Debtor borrowed $12,400,000.00 (the "Secured Loan") from Nomura Asset Capital Corporation ("Nomura") pursuant to a Deed of Trust Note dated January 23, 1996, from the Debtor to Nomura, as payee, as amended by that certain Amendment to Deed of Trust dated February 19, 1996 (the "Note"). Nomura endorsed the Note to a commercial mortgage securitized trust, now named for Bank of America, N.A., as successor by merger to LaSalle Bank National Association, as Trustee for the Registered Holders of Asset Securitization Corporation Commercial Mortgage Pass-Through Certificates, Series 1996-D2 (the "Trust"). CWCapital Asset Management LLC ("CWCapital") is the special servicer for the Trust.

17. CWCapital asserts that the Note is secured by the Deed of Trust, Assignment of Leases and Rents and Security Agreement dated as of January 23, 1996, from the Debtor to John T. Kieley and J. Bruce Hale, as Trustees for the benefit of Nomura (the "Deed of Trust"). CWCapital further asserts that this Deed of Trust encumbers the real property and improvements thereon commonly known as the Hotel, and all easements, fixtures, personal property, leases and rents, insurance proceeds and other cash, accounts, and proceeds from the Hotel. CWCapital also asserts that the Note is further secured by an Assignment of Leases and Rents dated January 23, 1996 (the "ALR") from the Debtor to Nomura.

18. In January 2002, Nomura executed an assignment of the Deed of Trust and related documents, which effectively assigned its rights and interests in the Deed of Trust and the ALR to the Trust.

19. As of the Petition Date, the principal amount due under the Note is approximately $9,209,000.00.

## D. Circumstances Leading to the Commencement of the Chapter 11 Case

### General Economic Conditions

20. In the years preceding 2009, the Debtor experienced a substantial decrease in revenues due to a number of factors, including (a) increased competition in the hospitality industry and (b) decreased business and consumer spending resulting from the prolonged global economic recession. The Debtor has sought the protection of chapter 11 to preserve going concern value and pursue strategic alternatives, including a plan of reorganization.

## Loan Default and Forbearance

21.     The Debtor is required to make monthly payments under the Note, due on the eleventh day of each calendar month. The Debtor did not make its scheduled payment for April 11, 2010. Pursuant to the Deed of Trust, the Debtor also executed an account agreement which required it to deposit all rents and revenues from the Hotel into a clearing account to secure repayment of the Secured Loan. On March 31, 2010, the Debtor notified the Trust that it was no longer depositing funds into the clearing account. As a result of these events, the Note is currently in default.

22.     After the default events, in June 2010, the Trust sought the appointment of a receiver for the Hotel by filing an emergency petition with the Montgomery County, Maryland Circuit Court. After a hearing in August 2010, the Debtor obtained a continuance for approximately 60 days so that it could attempt to sell the Hotel to a third-party buyer. In September 2010, the Trust also filed an Order to Docket Foreclosure of Deed of Trust, seeking to foreclose on the Hotel pursuant to the Debtor's default under the Note.

23.     Thereafter, the Trust and the Debtor entered into discussions over a possible forbearance agreement. The parties were unable to agree on certain materials terms, however, and negotiations over the forbearance agreement recently fell apart.

24.     To help ensure that day-to-day operations continue uninterrupted, that administrative expenses in these chapter 11 cases are paid, and that an orderly process can be implemented to create an ongoing path for the Debtor and its employees, the Debtor determined

that it was in the best interest of the Debtor, its estate, and its creditors to commence this chapter 11 case.

25. After filing its petition, the Debtor intends to operate its business in the ordinary course, while pursuing all options for maximizing value. In the various First Day Motions, the Debtor seeks relief on an expedited basis that will help preserve the value of its assets and permit it to conduct this case efficiently and economically. The basis for each of the First Day Motions is set forth below.

## PART II

### First Day Motions and Applications

26. In order to enable the Debtor to minimize the adverse effects of the commencement of these chapter 11 cases, the Debtor has requested various types of relief in the First Day Motions filed concurrently with this Declaration. A summary of the relief sought in each First Day Motion is set forth below.

27. I have reviewed each of these First Day Motions (including any exhibits and schedules thereto). The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption to its current business operations; and (b) is essential to maximizing the value of the Debtor's assets for the benefit of its estate and creditors.

A.  **Application of Debtor for Order Under 28 U.S.C. § 156(c) Authorizing and Approving the Retention of and Appointing BMC Group, Inc. as Noticing, Claims and Balloting Agent**

28. The Debtor seeks entry of an order authorizing and approving the retention of and appointing BMC Group, Inc. ("BMC"), *nunc pro tunc* to the Petition Date, as claims, noticing and balloting agent (the "Claims and Noticing Agent") for the Debtor and, as applicable, the Clerk to, among other things: (i) serve as the Court's notice agent to mail certain notices to the estate's creditors and parties-in-interest, (ii) provide computerized claims, claims objections and balloting database services, and (iii) provide expertise, consultation and assistance with claim and ballot processing and with other administrative information related to the Debtor's bankruptcy case. The Debtor believes it is in the best interests of its estate and its creditors to appoint BMC as agent for the Clerk.

29. I understand that BMC has significant experience in noticing, claims processing, assisting with claims reconciliation and distribution. I believe BMC is well qualified to provide the Debtor with experienced noticing, claims and balloting services in connection with this case, and has substantial experience in the matters upon which it is to be engaged.

30. Accordingly, I believe it is in the best interest of the Debtor's estate to seek the entry of an order retaining and appointing BMC as the agent for the Clerk and as custodian of official court records and to perform such other services as may be required by the Debtor. Additionally, the Debtor seeks authorization to compensate BMC for services rendered and to reimburse BMC for expenses incurred without further order of this Court upon the Debtor's receipt of reasonably detailed statements of fees and expenses.

B.  **Debtor's Motion for an Order Establishing Procedures for Interim Compensation Pursuant to Section 331 of the Bankruptcy Code**

31.     The Debtor filed a motion seeking the entry of an order establishing procedures for monthly compensation and reimbursement of expenses for professionals (each a "Professional") retained in this chapter 11 case (the "Interim Compensation Motion"). With the likely involvement of Professionals on behalf of the Debtor or any statutory committee of unsecured creditors, the Professional fee application and review process could be burdensome on the Debtor, the Professionals, and the Court. Implementation of compensation procedures (the "Compensation Procedures") will provide an efficient structure for disbursing compensation to the Professionals and will allow all parties to this case to monitor the monthly accrual of compensation for each Professional. I believe that approving the Compensation Procedures set forth in the Interim Compensation Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest.

C.  **Motion of Debtor for Order Under 11 U.S.C. §§ 105, 363, 503(b), 1107, and 1108 Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System; and (IV) Waiver of Section 345(b) Deposit and Investment Requirements**

32.     The Debtor filed a motion which seeks authorization (1) to maintain its existing bank accounts and to pay any prepetition routine banking fees imposed by the financial institution where the Debtor's bank accounts are maintained, (2) to continue to use its existing check stock (to be marked "Debtor in Possession") and business forms until exhausted, (3) to continue to use its existing cash management system, and (4) for a limited waiver of the deposit

and investment guidelines imposed under section 345(b) of the Bankruptcy Code (the "Cash Management Motion").

33. The Debtor maintains its own separate cash management system (the "Cash Management System") using two separate accounts at Wells Fargo Bank, N.A. ("Wells Fargo"). The Debtor uses an operating account ("Operating Account") from which the Debtor pays its operating expenses and a separate petty cash account ("Petty Cash Account", and, collectively with the Operating Account, the "Bank Accounts") that typically contains a relatively small balance for use for day-to-day expenses, such as for small travel agent commissions, repair and maintenance items, office supplies, postage stamps, gas for the Hotel's shuttle van, and beer and wine deliveries (which must be paid COD).

34. Under the Debtor's Cash Management System, incoming funds are deposited into the Operating Account. The Debtor has a safe where cash is placed typically by the Hotel's bookkeeper pending deposit into the Operating Account (as well as the bookkeeper, the Hotel's General Manage has access to the safe). Checks are also deposited into the Operating Account. Credit cards are automatically deposited each night, through a credit card processing company, into the Operating Account. The Debtor has obtained approval from each credit card company to utilize its Operating Account at Wells Fargo as the depository institution into which the credit card funds are deposited. The process of obtaining approval from the credit card companies to change the bank and the account into which the funds are deposited is a lengthy and time consuming process (taking up to two weeks). Thus, any variation from the

procedure utilized at the present time would cause extreme disruption to the Debtor's operations and would be counterproductive to the orderly administration and reorganization of this case.

35. The Debtor's Cash Management System enables the Debtor to maintain control over the administration of the Debtor's accounts, each of which facilitates effective collection, disbursement, and movement of funds. The Debtor's Cash Management System is similar to those commonly employed by many other hotels because of the numerous benefits provided, including the ability to (a) quickly create status reports on the location and amount of funds, allowing management to track and control corporate funds; (b) ensure cash availability; (c) guard against check and bank fraud by reducing the number of accounts that require monitoring; and (d) reduce administrative expenses by facilitating the movement of funds.

36. In the Cash Management Motion, the Debtor also seeks a waiver of the United States Trustee's requirement that the Bank Accounts be closed and new postpetition bank accounts be opened at depositories authorized by the United States Trustee. If strictly enforced in this case, the United States Trustee's requirement would cause a severe disruption in the Debtor's activities and would impair the Debtor's ability to operate under chapter 11.

37. Maintenance of the Bank Accounts will greatly facilitate the Debtor's operations in chapter 11. As noted above, all revenues and income realized by the Debtor ultimately flows into the Operating Account. If the Operating Account was closed, the Debtor would have to open a new account and then attempt to arrange alternative electronic and manual payment procedures for payments into and out of the Debtor's accounts, which would completely disrupt the flow of postpetition receipts and disbursements. Opening a new account

would also disrupt the ability of the Hotel to accept credit card payments from patrons for a period of up to two weeks – which would significantly and adversely affect the Hotel's ability to operate and its cash flow. These disruptions would negatively affect and could irreparably harm the Debtor's ability to operate its business at this critical juncture. To avoid disruptions and delays in the operation of the Debtor's business, the Debtor should be permitted to maintain its existing Bank Accounts and, if necessary, to open new accounts as debtor in possession accounts or to close any unneeded existing accounts.

38. The Debtor's Cash Management System constitutes an essential business practice and was created and implemented by the management of the Debtor in the exercise of its business judgment. The widespread use of this particular Cash Management System, moreover, is attributable to the numerous benefits it provides, including the ability to (a) process and timely pay expenses; (b) allow a mechanism for deposits from revenues; (c) ensure cash availability; (d) control and monitor funds; and (e) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. In addition, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption of the Cash Management System will facilitate and enhance the Debtor's efforts to continue to operate postpetition.

39. To minimize expense to its estate, the Debtor also requests authority to continue to use all correspondence and business forms (including, but not limited to letterhead, purchase orders, invoices, etc.) until such time as the Debtor can effectuate the necessary changes to its pre-printed and computer-generated forms in order to add the "Debtor in

Possession" label. With respect to all pre-printed forms, the Debtor requests that it be allowed to continue to use its existing forms, provided that it adds the "Debtor in Possession" labels to forms that are ordered once the existing stock is depleted.

40. I believe it is critical that the Debtor continues to utilize its existing Cash Management System and continues to use its existing business forms, without disruption. The relief requested in the Cash Management Motion will help ensure the Debtor's smooth transition into chapter 11 and prevent the possible disruption and distractions that could otherwise divert the Debtor's attention from more pressing matters during this chapter 11 case.

D. **Motion Of The Debtor For An Order (I) Authorizing The Debtor To Pay Prepetition Sales, Use And Similar Taxes In The Ordinary Course Of Business And (II) Authorizing Banks And Financial Institutions To Honor And Process Checks And Transfers Related Thereto**

41. The Debtor has filed a motion seeking an order authorizing, but not directing, the Debtor to remit and pay certain prepetition sales and use taxes, occupancy taxes, and certain other governmental taxes (the "Taxes") that the Debtor, in its sole discretion, deems necessary, as and when they become due in the ordinary course of the Debtor's business, and (ii) authorizing financial institutions to receive, process, honor and pay all checks issued and electronic payment requests made relating to the foregoing.

42. In connection with the normal operations of its business, the Debtor collects and incurs various Taxes, which the Debtor remits to various federal, state, and local taxing authorities (collectively, the "Taxing Authorities"). The Debtor incurs personal property, occupancy, and sales and use tax obligations in the State of Maryland. The Debtor collects and

withholds sales and use taxes in connection with its hotel operations which are then turned over to the applicable taxing authorities on a monthly, quarterly or annual basis. The Debtor also incurs personal property and occupancy taxes in connection with its hotel operations.

43. The Debtor seeks authority to pay, in the Debtor's sole discretion, prepetition taxes owed to the Taxing Authorities (as defined below), including, without limitation, taxes subsequently determined upon audit to be owed for periods prior to the Petition Date. The Debtor requests authority to make such payments in an aggregate amount (excluding amounts paid prepetition by checks that have not yet cleared on the Petition Date) not to exceed $95,500, which is the aggregate maximum sum that the Debtor currently believes may be due on account of prepetition Taxes incurred in the period immediately preceding the Petition Date.

44. I believe that payment of the taxes is critical to the Debtor's continued, uninterrupted operations. Non-payment of the taxes may cause the Taxing Authorities to take precipitous actions, including but not limited to, conducting audits, filing liens, seeking to impose liability against the Debtor and its directors and officers, and, if applicable, seeking to lift the automatic stay, all of which would disrupt the Debtor's day-to-day operations and could potentially impose significant costs on the Debtor's estate. Payment of the taxes will avoid these unnecessary and potentially costly governmental actions. I therefore believe that such relief is in the best interests of the Debtor's estate.

E.  **Motion of the Debtor for an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment**

45. The Debtor has filed a motion seeking an order (a) prohibiting the Utility Providers (defined below) from altering, refusing or discontinuing service; (b) deeming the Utility Providers adequately assured of future performance; and (c) establishing procedures for determining additional adequate assurance of future payment.

46. In the normal course of business, the Debtor has relationships with various utility companies and other providers (each a "Utility Provider" and, collectively, the "Utility Providers") for the provision of telephone, gas, electricity and related services (the "Utility Services"). The Debtor estimates that its average monthly postpetition payments to the Utility Providers will aggregate approximately $36,000.

47. Because uninterrupted Utility Services are critical to the Debtor's ongoing operations, the Debtor seeks the entry of an order: (a) prohibiting the Utility Providers from altering, refusing or discontinuing services; (b) deeming Utility Providers adequately assured of future performance; and (c) establishing procedures for determining adequate assurance of future payment.

48. In order to provide adequate assurance of payment for future services to the Utility Providers, the Debtor proposes to make a deposit (a "Utility Deposit") equal to 50% of the Debtor's estimated cost of its monthly utility consumption to each Utility which the Debtor intends to continue to utilize during the course of this Case. The Debtor estimates that the Utility Deposits, in the aggregate, will total approximately $18,000. The Debtor proposes to

make Utility Deposits to each of the Utility Providers within ten days after the entry of an interim order, pending further order of the Court, for the purpose of providing each Utility Provider with adequate assurance of payment of its postpetition services to the Debtor.

49. In addition, the Debtor seeks to establish reasonable procedures by which a Utility Provider may request additional adequate assurance of future payment, in the event that such Utility Provider believes that its Utility Deposit does not provide it with satisfactory adequate assurance.

50. It is my belief that the Debtor cannot continue to operate without continued Utility Services. If any of the Utility Providers alter, refuse or discontinue service, even for a brief period, the Debtor's business operations would be severely disrupted. In contrast, the Utility Providers will not be prejudiced by the continuation of their services and will be paid all postpetition utility charges. It is therefore critical that Utility Services continue uninterrupted. I believe that such relief is in the best interests of the Debtor's estate.

E. **Debtor's Motion (A) for Authorization to (I) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; and (II) Provide Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363 and (B) to Schedule a Final Hearing Pursuant to Bankruptcy Rule 4001**

51. The Debtor has filed a motion for authorization (a) on an interim basis (i) to use cash collateral, and (ii) to provide adequate protection to its prepetition lender who asserts an interest in cash collateral, and (b) to schedule a final hearing for authorization (i) to use cash collateral, and (ii) to provide adequate protection to its Prepetition Lender (the "Cash Collateral Motion").

52.     The Debtor requires the use of the cash collateral in which the prepetition lender asserts an interest to fund the Debtor's operations and the administration of its estate. The use of cash collateral will provide the Debtor with the funds with which to operate its business, pay the workers employed at the Hotel and the Debtor's other expenses including professional fees and expenses, and to maximize the value of its estate for the benefit of its creditors. The Debtor seeks authorization to use the cash collateral and to grant adequate protection to the prepetition lender for its interests in the prepetition collateral, solely to the extent of any diminution in value of the prepetition collateral.

53.     Without the use of cash collateral, the Debtor will not be able to operate the Hotel and its revenues will be zero. The Debtor's use of cash collateral will allow the Debtor to maximize the recoveries for all creditors. The Debtor proposes to make and grant to the prepetition lender, as adequate protection of the prepetition lender's interest in the prepetition collateral and solely to the extent of any diminution in value of the prepetition collateral, certain adequate protection payments and replacement liens.

54.     The Debtor has an urgent and immediate need for cash to continue to operate. Absent immediate authority to use the cash collateral, the Debtor will not have sufficient funds with which to operate its business and pay the other administrative expenses incurred in connection with its Chapter 11 case. The value of the Debtor's estate and the prepetition lender's interest in the prepetition collateral would decline immediately and dramatically in the absence of the relief requested herein. Entry of the emergency interim order is necessary to avoid immediate and irreparable harm to the Debtor's estate and, therefore, is

appropriate under the circumstances. Absent authorization from the Court to use the cash collateral, as requested, on an interim basis pending a final hearing on the Cash Collateral Motion, the Debtor and its estate will be immediately and irreparably harmed. Accordingly, I believe the interim relief requested in the Cash Collateral Motion is critical to preserving and maximizing the value of the Debtor's assets for the benefit of its estate and creditors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 28, 2011

Hardage Hotels II, L.P.,
a Delaware limited partnership

By: HSH II, Inc.
Its General Partner

By: Samuel A. Hardage
Title: President